**INSURANCE RESEARCH SERVICE, Inc., Plaintiff,**

v.

**ASSOCIATES FINANCE CORPORATION, Protective Insurance Agency, Inc., and Charles Burkhalter, Defendants.**

**No. 1921.**

United States District Court
M. D. Tennessee, Nashville Division.
July 13, 1955.

James L. Roberts and C. Allen High, Nashville, Tenn., for plaintiff.

James M. Swiggart, James Clarence Evans, Thomas M. Evans, and Lewis S. Pope, Nashville, Tenn., for defendants.

WILLIAM E. MILLER, District Judge.

This is an action of libel predicated upon two letters written by defendant Burkhalter while in the employment of defendants, Associates Finance Corporation and Protective Insurance Agency, Inc.

The plaintiff contends that the two letters, one dated November 10, 1953, and the other November 13, 1953, were libelous per se, that they were duly published, that they were written by Burkhalter in the course of his employment by Associates and Protective, and that it is entitled to a recovery against all defendants for both actual and punitive damages, without proof of special damages.

The defendants interpose a number of defenses to the plaintiff's claim:

That the letters were written by Burkhalter outside the scope of his employment by Associates or Protective and that they are not, in any event, accountable therefor; second, that the letters, particularly the letter of November 13, 1953, were qualifiedly privileged, and the plaintiff's action must therefore fail in the absence of proof of actual malice; third, that the allegedly libelous statements were true in fact; fourth, that the letter of November 10, 1953, having been written to the plaintiff, was not published within the meaning of the law of libel; sixth, that the letter of November 13, 1953, was not published because there is no proof that the letter was understood by any third person as identifying or referring to the plaintiff; seventh, that the letters in fact were not written of and concerning the plaintiff; and, eighth, in any event, that there is no warrant under the proof for recovery of more than nominal damages.

Defendant, Associates, is an Indiana corporation domesticated and doing business in Tennessee. Its principal business is financing the purchase of automobiles. Defendant, Protective, is a Tennessee corporation, and the defendant, Burkhalter, is a citizen and resident of that state. Plaintiff, Insurance Research Service, Inc., is a Missouri corporation.

The president of both Associates and Protective is Dan Maddox who individually owns all of the stock of Protective and 50 per cent of the stock of Associates. The other 50 per cent of Associates' stock is owned by another corporation, Associates Investment Company, which in turn owns all of the stock of EMMCO Insurance Company, of South Bend, Indiana.

Protective was organized for the purpose of managing and directing Associates' insurance program which appears to be a definite part of its business in financing the purchase of automobiles. As a part of this program, Protective supervises the obtaining of insurance upon the automobiles financed by Associates, primarily to protect Associates' se-

curity interest therein. It also performs insurance adjusting services.

The close relationship between Associates and Protective is shown by the fact that Burkhalter, the director of Protective's insurance program, was employed by Associates and that Associates pays his salary. There is evidence that in certain instances Protective paid expenses in connection with its business by using the funds of Associates, and upon the whole record there can be no doubt that the activities of the two corporations are so closely interwoven that they must be regarded, at least for the purposes of the present action, as part and parcel of the same organization.

EMMCO is engaged in a general automobile insurance business and maintains a working arrangement with Protective. It refers its adjustment work in the Nashville area to Protective and Protective reciprocates when it has claims arising in the territory of EMMCO. Employees of the two corporations meet together for study of their joint problems.

Plaintiff, a Missouri corporation, with principal place of business at Kansas City, Missouri, conducts a general adjustment business for various insurance companies, and in addition it acts as the representative in this country of a number of foreign underwriters, including underwriters at Lloyd's and other companies in England, both in writing insurance and in adjusting claims.

In April or May of 1953, Associates, apparently for the first time, began taking insurance on automobiles which it financed, upon certificates of insurance executed by plaintiff as the representative of "Underwriters at Lloyd's and/or companies in England".

Thereafter, until August 1953, when losses occurred under the certificates so issued by plaintiff, the adjusting services were performed by Protective which reported directly to the plaintiff in Kansas City, Missouri, which in turn reported to the underwriters in England.

The letter of November 10, 1953, was written by Burkhalter on behalf of Protective to R. E. Lawrie as Claims Manager of plaintiff (he was also its President and a substantial stockholder), in regard to an item of adjustment expense which had been incurred by Protective in connection with a loss occurring July 4, 1953, under certificate issued by plaintiff to Associates and James H. Strength. Protective, in adjusting the claim, had incurred an item of expense of $11.46, for which it had billed plaintiff. On November 6, 1953, plaintiff wrote Protective that "underwriters have denied this billing as they do not consider that your long distance calls in clearing a claim are their obligation and certainly not your office time in processing the claim especially since it is your business". In its reply of November 10, written by Burkhalter on its behalf, Protective acknowledged receipt of the November 6 letter as follows:

"I have your letter of November 6, 1953 and am not too surprised at your organization's refusing to pay this just and exact charge for handling loss in the above caption. We have decided that your organization is not to willing to pay anything, including claims.

"If you will disregard any future charges that we have made for handling your claims, it will be perfectly agreeable with me. I have only one request of your organization, and that is that your give your just claims attention and make payment on same. We are not accustomed to doing business in the matter (manner) in which you and your organization insist."

The November 10 letter was dictated by Burkhalter to his stenographer in his office in Nashville, but other than the fact that the letter was received by Lawrie and read by him in his office at Kansas City, Missouri, there is no evidence that it was seen or read by any other person after it was mailed.

The letter of November 13 was written by Burkhalter for Protective to E. P. Aldrich, Assistant Secretary of EMMCO at South Bend, Indiana, concerning an

item of adjustment expense which had been incurred by EMMCO under certificate issued by plaintiff to Associates and Carl T. Larson. The adjustment of the loss had been referred by Protective to EMMCO since it occurred in its territory, and in adjusting the loss EMMCO incurred an item of expense of $13.02, for which it billed Associates on October 19, 1953.

On November 7, 1953, plaintiff wrote EMMCO directly, refusing payment of the charge "on behalf of Underwriters" on the ground that EMMCO had not been authorized to represent the plaintiff in the adjustment of the loss. It was pointed out that all authorizations for loss handling emanate from plaintiff's office and that plaintiff had its own regularly appointed adjusters with whom it dealt. Plaintiff's letter of November 7, having been received by EMMCO, was forwarded to Protective by letter of November 11, 1953, in which EMMCO stated: "We are attaching a copy of the letter just received from the Insurance Research Service, Inc., for we thought you would be interested in knowing the attitude taken by that company on the adjustment of claims under Lloyd's insurance certificates". In this letter the subject matter is described as "Carl T. Larson, Policy No. 9605, Lloyds of London, Collision 7–6–53". Indeed, the plaintiff in its letter of November 7 also described the subject matter as "Lloyds certificate AU 9605, Insured Sgt. Carl T. Larson".

After receiving EMMCO's letter of November 11, enclosing plaintiff's letter of November 7, Burkhalter on behalf of Protective, wrote the letter of November 13, 1953, addressed to Mr. E. P. Aldrich, Assistant Secretary, EMMCO Insurance Company, South Bend, Indiana, with a copy to plaintiff at Kansas City, Missouri. This letter reads as follows:

"We have for acknowledgment your letter of November 11, 1953 to which was attached copy of letter from Mr. R. E. Lawrie dated November 7, 1953, regarding payment of your service bill on the above loss.

"This company is building a terrific reputation for paying none of their bills, and it looks as though we will have to sue them to get anything out of them, either for claims or adjustments.

"In order to prevent any ill feeling between your good company and ours, we are enclosing Associates Finance Corporation's Check No. 42486 in the amount of $13.02, representing your service bill. After all, this assignment was given you in good faith and at the time of assignment, we had no instructions to the contrary from Lloyds of London.

"We are indeed sorry for any inconvenience caused, and are

"Very truly yours,"

The November 13 letter was also dictated by Burkhalter to his stenographer in his office at Nashville and it was received and read by Aldrich in South Bend, Indiana. Whether it was read by any other person is not shown, although it appears that the letter, after being read by Aldrich, was in due course filed with the records of EMMCO.

Plaintiff concedes that its claim based upon the November 10 letter would, under the rule obtaining generally and in Tennessee, fail for lack of publication. But it is argued that the question is governed by Missouri law, of which this Court will take judicial notice, which makes communication of a libel "to the party libeled" a sufficient publication for civil liability.

■■ That liability for an allegedly defamatory publication is determined by the law of the jurisdiction in which such publication is made appears to be the well settled general rule. O'Reilly v. Curtis Publishing Co., D.C., 31 F.Supp. 364; Restatement of the Law, Conflict of Laws, Secs. 377 and 378; 53 C.J.S., Libel and Slander, § 1b, p. 35. And where there is diversity of citizenship, a federal court will apply the law of conflicts of the state in which it sits. Hutto v. Benson, D.C., 110 F.Supp. 355.

Subject to important exceptions to be noted below, Tennessee adheres to the principle that the law of the place where a wrong is committed must determine the rights of the parties affected by such wrong. Parsons v. American Trust & Banking Co., 168 Tenn. 49, 76 S.W.2d 698; Virginia Avenue Coal Co. v. Bailey, 185 Tenn. 242, 205 S.W.2d 11.

■ It becomes necessary, therefore, to examine the law of Missouri upon the question as to the sufficiency, in a civil case, of a publication of a libel to the complaining party. In doing so, this Court takes judicial notice of both the common and statutory laws of that state. Tennessee Code Secs. 9773.1, 9773.2; 5 Moore's Fed.Practice, Sec. 43.09; Rule 43(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

The Missouri statute, Rev.Statutes, Sec. 559.430, V.A.M.S., relied upon by plaintiff, is a criminal statute, almost identical to Tennessee's, which provides that communication of a libel "to the party libeled" constitutes a publication. But contrary to the settled rule in Tennessee that its criminal statute has no application in a civil action of libel, two intermediate appellate courts of Missouri have held that its criminal statute applies as well in civil cases so as to make communication to the complaining party a sufficient publication to ground an action for damages. Houston v. Woolley, 37 Mo. App. 15 (Kansas City Court of Appeals); Wright v. Great Northern Railway Co., Mo.App. 186 S.W. 1085 (St. Louis Court of Appeals); Beddell v. Richardson Lubricating Co., Mo.App. 226 S.W. 653 (Kansas City Court of Appeals). But that the lower courts of Missouri are not in agreement is indicated by the holding, albeit a dictum, in Howard v. Wilson, 195 Mo.App. 532, 536, 192 S.W. 473 (Springfield Court of Appeals), and the vigorous dissent of Cave, Presiding Judge, of the Missouri Court of Appeals, in Jacobs v. Transcontinental & Western Air, Inc., Mo.App., 205 S.W.2d 887 (Kansas City Court of Appeals). The decision of the majority in that case was certified to the Missouri Supreme Court be-

cause of its conflict with the ruling in Howard v. Wilson, supra, but the Supreme Court reversed the Court of Appeals upon another and distinct ground and left the conflict unresolved. Jacobs v. Transcontinental & Western Air, Inc., 358 Mo. 674, 216 S.W.2d 523, 6 A.L.R. 2d 1002.

■ In view of the unsettled state of the law in Missouri reflected by the diversity of opinion of its lower courts, it would appear to be the duty of this Court, for the purposes of the present case, to apply that rule which, in its opinion, has the greater support in reason, or that rule which it believes will be declared by the highest court of Missouri when the question is squarely presented to it.

■ For a number of cogent reasons the Court is persuaded that the true rule in Missouri is represented by the view of the minority of the intermediate appellate courts of that state rather than the majority.

That Missouri, apart from the statute in question, follows the universal rule that communication of a defamatory statement to the plaintiff is not a publication in the sense of the civil law, is clearly indicated by the holding in Landis v. Campbell, 79 Mo. 433, 440, 49 Am. Rep. 239, where the court stated "it is also correctly declared that the writing and sending of the letter in evidence by defendant Sanders to plaintiff was no publication of the libel."

An intention to change a rule so deeply embedded in the common law of Missouri should not be attributed to the Legislature of that state unless such intention is clearly and unmistakably disclosed. The intention to do so can not reasonably be spelled out from a criminal statute, the manifest purpose of which is to prevent breaches of the peace. As a libel written only to the complaining party may tend to provoke that party to wrath, Missouri has condemned it as a criminal offense, as have the legislatures of other states, but to say that in doing so, it meant to impose an additional lia-

bility in damages is to ignore the manifest difference between civil and criminal actions of libel. The gravamen of a tort action is damage to the person libeled, either actual or inferred, an element wholly lacking where the libel is directed to the person libeled and known only to him. It may provoke him to wrath; it may breach the peace; but it does not damage him in his credit or his reputation.

But if the Missouri statute is construed as contended by plaintiff, the Court is of the opinion that its claim based on the November 10 letter must fail for another reason. So construed, the Missouri statute would clearly be penal in nature in that it would impose an additional penalty, i. e., damages, for violation of a criminal statute without regard to actual damages.

■ When a Tennessee court is called upon to enforce the laws of a sister jurisdiction it will determine whether such laws are penal in nature or contrary to its public policy. Whitlow v. Nashville, C. & St. L. Ry. Co., 114 Tenn. 344, 84 S.W. 618, 68 L.R.A. 503; Paper Products Co. v. Doggrell, 195 Tenn. 581, 261 S.W.2d 127, 42 A.L.R.2d 651.

"A statute giving a right of recovery is often penal as to one party and remedial as to the other. In such cases it has been held that the true test is whether the main purpose of the statute is the giving of compensation for an injury sustained, or the infliction of a punishment on the wrongdoer." 15 C.J.S., Conflict of Laws, § 5d, pp. 856 and 857.

In Paper Products Co. v. Doggrell, supra, a creditor of an Arkansas corporation sued certain stockholders of the corporation who were residents of Tennessee, in a Tennessee Court, to enforce personal liability upon a corporation note, upon the theory that the corporate charter had not been filed with the county court clerk in Arkansas, although it had been filed with the Secretary of State. The Arkansas statute required corporate charters to be filed both with the Secretary of State and with the county court clerk before incorporation was complete.

This statute was construed by the Arkansas courts as imposing personal liability upon the stockholders in the absence of a filing of the corporate charter with the county court clerk as required by the statute. The rule in Tennessee was just the opposite, its courts holding that failure to comply with this detail of incorporation was not sufficient to defeat the de facto existence of the corporation or to impose personal liability upon the stockholders.

It was insisted that the Tennessee court should follow the Arkansas rule, but the Supreme Court of Tennessee refused to do so because it found that the Arkansas rule was penal in nature in that its purpose was to enforce compliance with the statute requiring the filing of the charter. The Supreme Court pointed out that under the Arkansas rule personal liability is imposed without regard to the fact that a creditor is not prejudiced by the failure to comply with this detail and was not misled thereby. The court stated that [195 Tenn. 581, 261 S.W.2d 129] "there is no escape from the conclusion, therefore, that this rule prescribes a penalty in order to enforce a compliance with the law of Arkansas as to the registering of a charter in the county where the principal office of the corporation is maintained".

■ By parity of reasoning, it is manifest that if the Missouri criminal statute is construed to make communication to the libeled party sufficient in a civil case, it is penal in character and should not be followed by the courts of Tennessee. The effect of such a rule would be to impose, by force of a criminal statute, a civil liability upon the party responsible for the libel, without regard to the fact that such civil liability could have no reasonable relationship to actual damages. Its sole purpose would be punishment. That the Tennessee courts would so hold and would refuse to enforce such a rule in Tennessee, where there is a similar criminal statute, is clearly indicated by the decision in Fry v. McCord Bros., 95 Tenn. 678, 690, 33 S.W. 568, 571, where the court pointed out the

clear distinction between civil and criminal actions for libel:

"It is proper to state that there is a marked difference between civil and criminal actions for libel,—so far, at least, as the question of publication is concerned. In the former, publication must be made to some third person, or in such public manner as to reach third persons; but, in criminal proceedings, publication may be made by communicating the printed matter alone to the party libeled. Mill. & V.Code, § 5552; Hodges v. State, 5 Humph. 112; Swindle v. State, 2 Yerg. 581; State v. Hollon, 12 Lea 482; Newell, Defam. p. 236, § 6; Townsh.Sland. & L. § 198, note 4. The reason for this difference is that in a civil action of libel the gravamen of the action is the pecuniary damage to the character or credit of the party libeled, but in a criminal action the ground of the offense is the liability of the words written to provoke a breach of the peace. In the civil action the only publication that could injuriously affect the credit and character is that made to third persons, as no damage to credit or character could result from a letter or writing known only to the party to whom it is sent, and not communicated to others. State v. Avery, 18 Am.Dec. 105. In criminal actions, however, it is evident that the liability to provoke a breach of the peace is as great when the letter is seen only by the party to whom it is sent as it is when communicated to others. Hence, it has been held that an indictment must charge that the intention in sending the letters was to provoke a breach of the peace; when the fact is that such letters have not been read or seen by some third person. Hodges v. State, 5 Humph. 112."

■ For this additional reason, therefore, it must be held that receipt by the plaintiff through its President of the letter of November 10 is not a publication and that the plaintiff's claim for relief, based upon the writing of that letter, must be denied.

■ There appears to be no question in the law of defamation that liability is not established unless the allegedly defamatory statement is *in fact* understood by a third person as referring to plaintiff. Restatement of the Law, Torts, Sec. 564 and comments; 53 C.J.S., Libel and Slander, § 82a, p. 133; 33 Am.Jur., Sec. 89, p. 102; Annotation 91 A.L.R., p. 1171; Tompkins v. Wisener, 33 Tenn. 458.

" * * * It is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff * * *. If, however, the recipient does not understand that the plaintiff is intended thereby, the fact that the defamer intended to refer to him is immaterial." Restatement of the Law, Torts, Sec. 564, Comment, paragraph a.

■ On the other hand, "If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is immaterial that the defamer did not intend to refer to him". Restatement of the Law, Torts, Sec. 564, Comment, paragraph b.

That Indiana, the state in which the November 13 letter was received and read, has the same rule, is indicated by Drummond v. Leslie, 5 Blackf. 453, decided by the Supreme Court of Indiana in 1840, and cited in support of the rule in Annotation 91 A.L.R. 1163, 1164.

■ The factual question as to whether the recipient actually understood the allegedly libelous words as referring to the plaintiff is to be determined from all of the facts of the case, including the circumstances of the publication known to such person and the entire language used. 33 Am.Jur., Sec. 85, p. 99; Restatement of the Law, Torts, Sec. 563, Comment, paragraph 3, and Sec. 564, Comment, paragraph b. The recipient's testimony as to his understanding is not conclusive on the issue, but should

be weighed with the other evidence in the case to determine its correctness.

The Court inquires, therefore, whether Aldrich, the recipient of the November 13 letter, actually understood the allegedly libelous words of the second paragraph as referring to the plaintiff. It was his positive testimony that he interpreted the second paragraph of the letter, not as having reference to plaintiff, but to Lloyd's of London as the insurance underwriter.

While it may be argued that Aldrich was an interested witness due to the relationship between EMMCO and the defendants, the Court believes that his unequivocal testimony should not be rejected unless it can be said that it is unreasonable in the light of the letter itself, the correspondence which preceded it, and the attendant circumstances.

There are a number of important factors disclosed by the evidence which would clearly support the interpretation of the November 13 letter as referring to Lloyd's of London as the party responsible for payment of claims and expenses under the certificates and the party subject to suit therefor in the event of non-payment.

While the plaintiff's President, R. E. Lawrie, testified that the insurance was actually placed under the certificates, issued to Associates and its customers, with companies in England not associated with Lloyd's, that fact was not communicated to either Protective or Associates, and it was certainly not known to Aldrich or EMMCO. Associates was solicited for the insurance upon the representation that the underwriters would be Lloyd's of London or companies associated in doing business at Lloyd's. It was understood at all times by Protective and Associates that the certificates of insurance were actually those of Lloyd's or associated companies.

Furthermore, all parties concerned appear to have understood fully that plaintiff was acting merely as the representative of foreign underwriters and had no legal liability either for claims or ad-justment expenses under the certificates. Apparently, the first knowledge which Aldrich had of plaintiff's connection with the insurance was derived from plaintiff's letter to EMMCO of November 7, 1953. In that letter the plaintiff not only described the certificate as a Lloyd's certificate, but denied EMMCO's bill for adjustment expenses not on behalf of itself but "on behalf of underwriters". Aldrich could fairly infer from this letter that the insurance underwriter was Lloyd's and that the plaintiff was acting as the representative of the Underwriters with no legal responsibility for adjustment expense or claims. Having forwarded this letter to Protective, EMMCO received in reply the letter of November 13, the second paragraph of which is alleged to have been libelous and to have referred to the plaintiff. But when the letter itself is analyzed, it will be seen that it is reasonably susceptible to the construction that the second paragraph has reference to Lloyd's of London. Lloyd's is described in the caption of the letter as the underwriter, and it is again referred to in the closing paragraph, where it is stated that at the time the adjustment of the Larson claim was referred to EMMCO "we had no instructions to the contrary from Lloyd's of London."

The natural meaning of the letter is that Protective was complaining about failure to pay claims and adjustments under the Lloyd's certificates, and it is altogether reasonable that Aldrich would, therefore, construe the language of the second paragraph as having reference to the party actually liable for such claims or adjustments. To apply the language to a mere representative who has no liability for claims or adjustments and could not be sued therefor, would require an unnatural and unwarranted construction.

There is much evidence in the case bearing upon Burkhalter's intention in writing the letter and his justification for doing so, but such evidence is largely immaterial since many of the circumstances involved were not known to Al-

drich and could have no bearing upon his understanding.

From the standpoint of the recipient of the letter, with the facts which he had before him, including the letter itself and other correspondence, the Court concludes that his interpretation of the language as applying to Lloyd's of London was at least a reasonable one and that his testimony to that effect should be accepted.

Insofar as it is claimed that the two letters were published when dictated by Burkhalter to his secretary in Tennessee, the contention must fail because the Tennessee rule is to the contrary. Freeman v. Dayton Scale Co., 159 Tenn. 413, 19 S.W.2d 255.

As the plaintiff's action must be dismissed for the reasons herein assigned, it is not necessary to discuss other defenses.

Judgment will be entered accordingly.