**STONES RIVER MOTORS, INC. and
Kenneth W. Snell,
Plaintiffs-Appellants,**

v.

**MID–SOUTH PUBLISHING COMPANY,
INC., d/b/a The Daily News Journal;
Donald H. Keith, d/b/a The Press; Bill
Bickford, Mary Jo Bickford, and Christie Bickford, Defendants-Appellees.**

Court of Appeals of Tennessee,
Middle Section.

Jan. 26, 1983.

Application for Permission to Appeal
Denied by Supreme Court

May 2, 1983.

714

Frank M. Fly, Murfreesboro, for plaintiffs-appellants.

James C. Cope, Murfree & Cope, Murfreesboro, for Mid-South Pub. Co., Inc., d/b/a The Daily News Journal.

Alfred H. Knight, Willis & Knight, Nashville, for Donald H. Keith, d/b/a The Press.

John S. Lansden, Murfreesboro, for defendants-appellees Bill Bickford, Mary Jo Bickford and Christie Bickford.

## OPINION

CONNER, Judge.

This is an appeal by the losing plaintiffs from an order of summary judgment in a libel case based upon a consumer complaint letter which was published in the "Letters to the Editor" sections of two Rutherford County newspapers.

The plaintiffs-appellants[1] are Stones River Motors, Inc., a new and used car dealership located in Murfreesboro, Tennessee, and Kenneth W. Snell, part owner and president of Stones River Motors. The defendants are Bill Bickford, writer of the alleged libelous letter, his wife, Mary Jo Bickford, his daughter Christie Bickford, and the two newspapers that published the letter, the *Daily News Journal* and *The Press.* The writing in question[2] describes a series of transactions and events arising from the purchase of two used automobiles from Stones River Motors by Bill Bickford for his daughter Christie Bickford and is very derogatory in nature regarding the Bickfords' experience with the dealership.

Although there is some minimal dispute as to exactly what occurred between the parties at various times during their dealings with each other, the substantive events are capable of summarization. The Bickfords purchased a 1972 Datsun without warranty from Stones River Motors for $800.00. Two days after the purchase the car had mechanical problems and was towed to Stones River Motors for repairs

where Mr. Bickford and Mr. Snell agreed to split the resulting bill of $140.00. Within four days after the car was repaired, it "threw a rod," whereupon the Bickfords traded it for a 1969 Datsun, paying the dealership an additional $110.00. Soon after the trade-in the second car developed mechanical problems which Mr. Bickford wanted Stones River Motors to fix free of charge. When this was not done, Mr. Bickford wrote by typewriter the subject "letter to the editor" and delivered it to the defendant newspapers. Mr. Bickford typed at the end of the letter his name, his wife's name and his daughter's name as purported signatories. However, the proof shows neither had knowledge that Mr. Bickford had written or delivered the alleged libelous writing.

The letter while detailing these events contained some strong language concerning the experiences of the Bickford family and their frustration with the sequence of events, and when published, was under two less than complimentary headlines. Mr. Bickford believed that the dealer should not have sold to his family cars so unserviceable and should have been more generous in handling repairs and trade-ins. In the writing these feelings regarding the trade-in are expressed as "highway robbery" while the entire series of transactions is characterized as a "rip-off." There is no significant dispute concerning the essentials of the Bickford complaint. The cars were purchased at the times and for the amounts stated, the described defects and breakdowns did occur and the response of Stones River Motors to these problems was as set forth in the letter.

The essence of Mr. Bickford's complaint was that Stones River Motors had sold him two unserviceable automobiles, and had not accepted the financial responsibility for the breakdown thereof which Mr. Bickford felt it should have accepted. There is no allega-

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

2. See appendix for full text of letter as it appeared in the April 5, 1979, edition of *The Press.*

tion that the plaintiffs violated their legal responsibilities. On the contrary, the Bickfords were disturbed precisely because they were treated in a "business is business" manner, when they had expected, or at least hoped for, a higher, more personal standard of treatment. Mr. Bickford sums up his substantive grievance by saying: "We honestly thought at the beginning it would be best to go to a reputable dealer, but I guess in these times one has to think of profits rather than customer service."

On the other hand, the substance of the plaintiffs' complaint is that their treatment of the Bickfords was in accordance with usual business practice and, therefore, justified; and that the Bickfords' complaints about that treatment were, therefore, unjustified. The disagreement between the parties is essentially one of attitude, not of fact. The Bickfords believed, justifiably or unjustifiably, that car dealers should accept responsibility when the used cars they sell immediately break down, and they expressed that belief vehemently. Mr. Snell believed, justifiably or unjustifiably, that this was an unfair assertion.

The letter was first published by the *Daily News Journal* on March 30, 1979. Prior thereto the *Journal* edited it deleting all references to the type and mode of car and replacing the words "Datsun Dealer" with "local import dealer." There was no direct reference to either plaintiff by name.

On April 5, 1979, *The Press* published the same letter except that as it appeared in *The Press* the manuscript was unedited and reference was made to a "Datsun" automobile and the local "Datsun Dealer." Testimony revealed that at the time of the publication of the letter Stones River Motors was the only dealership in the Murfreesboro area that sold both new and used Datsun cars.

After taking discovery, all defendants filed motions for summary judgment asserting among other defenses that the letter was not defamatory as a matter of law, the matters contained therein were true and there was no negligence. The trial court concluded that viewed in the light

most favorable to plaintiffs, as it must, *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476, 480 (Tenn.App.1978), there were no disputed issues of material fact that would permit a jury to find in favor of the plaintiffs and dismissed the complaint as to each defendant. Stones River Motors and Mr. Snell appeal claiming to the contrary.

## THE CLAIM AGAINST MARY JO AND CHRISTIE BICKFORD

First, as to the defendants Mary Jo and Christie Bickford, we affirm the trial court's dismissal of the action. In *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn.1978), our supreme court adopted as law § 580B of the *Restatement (Second) of Torts* (1977) which reads:

Defamation of Private Person

One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them.

It is clear that in order to find one liable under this standard, it must be shown that the party charged had some knowledge or awareness of the defamatory communication before it was published. All the proof before us shows that neither Mary Jo Bickford nor Christie Bickford was aware of the existence or contents of the subject letter before it was submitted to and published in the *Journal*. An essential element of libel is proof of publication, *Applewhite v. Memphis State University*, 495 S.W.2d 190 (Tenn.1973), and it is impossible to publish a document which one neither writes nor has an awareness of its existence. Plaintiffs' counsel correctly conceded in oral argument

that based on this record there is no cause of action against the wife and child.

## THE CLAIM AGAINST THE *DAILY NEWS JOURNAL*

■ Regarding defendant *Journal,* the determinative issue is whether as a matter of law the plaintiffs failed to prove that they were the subject of the alleged defamatory letter as it appeared in that paper. As an essential element of a cause of action for defamation, the plaintiffs must prove a false and defamatory statement *concerning another.* *Restatement (Second) of Torts* § 558 (1977) (emphasis added). Otherwise stated at common law, one of the required elements of proof was the "colloquim," a showing that the language was directed to or concerning the charging party. The burden of proving this element of the cause of action is on the plaintiff. 50 Am.Jur.2d *Libel and Slander* § 449, p. 972 (1970); *Restatement (Second) of Torts* § 480A, comment f (1977).

■ In *Insurance Research Service, Inc. v. Associates Finance Corp.,* 134 F.Supp. 54 (M.D.Tenn.1955), Judge Miller stated the rule in Tennessee that:

... liability [for defamation] is not established unless the allegedly defamatory statement is *in fact* understood by a third person as referring to plaintiff....

" * * * It is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff * * *. If, however, the recipient does not understand that the plaintiff is intended thereby, the fact that the defamer intended to refer to him is immaterial." Restatement of the Law, Torts, Sec. 564, Comment, paragraph a. *Id.* at 61. Where publication is generally disseminated, the foregoing requirement may be satisfied by evidence that the verbiage would have identified the plaintiff to a reasonable reader.

As noted above, defendant *Journal* edited the writing submitted by Mr. Bickford deleting any reference to identify the vehicle in question as a foreign car. Furthermore, the edited letter refers to the plaintiff dealership simply as "a local import dealer."

A representative of the *Journal* testified that the editing as done was intended to be sufficient to avoid any question of defamation of these plaintiffs or any other car dealers, new or used.

Further, the proof was that there were a number of used car dealers in the area selling all types of foreign makes, models, brands and colors. The edited letter made no reference to any particular type, brand, make, color or origin of the foreign made used car which could have been reasonably read or construed to have been purchased from these plaintiffs any more than any other used car dealer selling foreign used cars.

■ Though in no way directly identified in the *Journal* article plaintiffs argue since there were only two authorized manufacturer's representatives of "new" foreign import cars in Murfreesboro, Tennessee, at the time of the letter that the letter was defamatory toward them. We are unable to agree with this contention. First, assuming *arguendo* the correctness of plaintiff's interpretation, since there were two such dealers there is no indication as to which was involved. More significantly, we do not believe that a reasonable interpretation of the use of the phrases "certain foreign made car" or "local import dealer's lot," when discussing a used foreign car, can be construed as a reference to only one of the two existing authorized manufacturer's new car representatives of foreign automobiles in Murfreesboro. The article as published in the *Journal* deals with *used* cars and the record is clear that a number of dealers in and around Murfreesboro handle and sell foreign used cars.

Moreover, the word "local" as referring to the dealer is not defined. It does not indicate whether the dealer is located in the City of Murfreesboro, as opposed to Smyrna or Woodbury, also in the *Journal* market area. Television and radio advertising of car sales often refer to "local" dealers which may be located in nearby communities. Likewise, since the type of foreign

made used car is not identified in the *Journal* article, it is equally as reasonable to construe the referenced vehicle as any one of a number of foreign autos which might be for sale in Rutherford County. The letter writer does not in the article indicate where he resides and no reference in the letter is made to the City of Murfreesboro. On its face we find no basis for concluding that the *Journal* article could reasonably be construed by a third party as referring to the plaintiffs. Only after the unedited article appeared in *The Press* did plaintiffs make any complaint to the *Journal.*

A different result could possibly have been warranted on summary judgment had evidence been offered that the publication of the letter by the *Journal,* even though it did not refer directly to the plaintiffs, might have induced a reasonable reader to conclude that it was about them. In order to possibly prevent the trial court from granting summary judgment on this issue, the plaintiffs should have introduced testimony from readers of the subject article at the time of publication to the effect that such readers had reason to know or understand that it was directed at Stones River Motors or Kenneth Snell. This was not done. In fact, the only proof that anyone reading the *Journal* thought that the plaintiffs might have been the referenced parties was from Mr. Snell himself. This is not sufficient.

Since he himself had the unsatisfactory dealings with Mr. Bickford, Mr. Snell would, of course, know at whom that defendant's wrath was directed. However, the question is not whether he knew it, but whether there was third party awareness. As pointed out in *Insurance Research Service, Inc. v. Associates Finance Corp., supra,* the appropriate test is whether a reasonable third party recipient of the defamatory communication would and did understand it as intended to refer to the plaintiff, not whether the plaintiff himself has an awareness that he is the subject of the communication.

Obviously, the *Journal* made a good faith effort to withhold the identity of the dealership. The record discloses that the editing was done for the purpose of avoiding specific reference to any car dealer or make involved and that the employees of the paper who edited the letter believed it sufficient to accomplish the purpose intended. We have reservations as to whether any negligence could be shown as to this defendant even with the necessary testimony of third party awareness heretofore suggested, but not found herein. Independent of the questions raised by *The Press, infra,* which would be equally applicable, we hold that the abridgement of the letter prior to publication was sufficient to entitle the *Journal* to summary judgment.

## THE CLAIM AGAINST MR. BICKFORD AND *THE PRESS*

A much closer question is presented with respect to the plaintiffs' claim against the writer, Mr. Bickford, and *The Press.* The letter as written and as it appeared therein referred to the plaintiff dealership as the "Datsun Dealer" and to the purchased used car as a "Datsun." Because at the time the letter was published the plaintiff dealership was the only one in the Murfreesboro area that sold new and used Datsuns, we believe that it is reasonable to conclude that a plain and ordinary reading might lead one to believe that the letter referred to Stones River Motors and/or Kenneth Snell as the "Datsun Dealer."

The plaintiffs assert that the subject writing insinuates that they are "crooks, both personally and professionally, thereby impuning (sic) and defaming their honesty, integrity, virtue and good reputation in the community." In support of this assertion, the plaintiffs identified in their brief the following statements in the letter as it appeared in *The Press* which they argue are capable of being understood in a defamatory sense:

1. The title in the *Press* "Bickford Family Protests Auto Rip-Off."

2. "... but I figured I was dealing with a dealer so I couldn't go wrong."

3. "While getting ready to make the trade the dealer says 'We will have to have $110 extra for the trade to take care of overhead expenses, etc.' "

4. "Here is a perfect example of highway robbery in action."

5. "We do want to say that the service manager was very good to my daughter and did his best to see if things could be rectified, but he had his hands tied by the sales manager and the owner."

6. "I would like to sum up this letter by stating that we feel we have been ripped-off as teenagers would phrase it, and we honestly thought in the beginning it would be best to go to a reputable dealer, but I guess in these times one has to think of profits rather than customer service."

7. "I guess it goes right back to the old saying 'Made in U.S.A. is still the best bargain.' "

In support of their claim against Mr. Bickford and *The Press* the plaintiffs rely primarily on the Tennessee landmark decision of *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn.1978), which sets out much of the controlling law on defamation in Tennessee. An issue discussed in *Nichols* is the difference between a question of fact for the jury and a question of law for the judge with respect to the determination of whether a published statement is defamatory. The court in *Memphis Publishing Co.* held that whether an:

> ... article ... was, in fact, understood by readers in its defamatory sense is ultimately a question for the jury. But preliminary determination of whether the article is *capable* of being so understood is a question of law to be determined by the court.... (Emphasis in original.)

*Id.* at 419. *See also Restatement (Second) of Torts* § 614 (1977).

■ Therefore, in ruling on the trial court's dismissal of the plaintiff's claims against Mr. Bickford and *The Press* we must determine whether, as a matter of law, the Bickford letter as it appeared in *The Press* was capable of being understood by its readers in a defamatory sense. In making this determination, the alleged defamatory words must be construed in their "plain and natural" import. *Memphis Publishing Co. v. Nichols, supra* at 419, ftn. 7.

■ For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation. A libel does not occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element "of disgrace." W. Prosser, *Law of Torts,* § 111, p. 739 (4th Ed.1971). *See also Memphis Telephone Company v. Cumberland Telephone and Telegraph Company,* 145 F. 904 (6th Cir.1906) (holding that it was not libelous to state that the plaintiff was charging twice as much for its stock as the stock was worth, since it had a right to do so); and *Sweeney v. Newspaper Printing Corporation,* 177 Tenn. 196, 147 S.W.2d 406 (1941) (holding that it was not libelous to state that the plaintiff had opposed a job application because the applicant was a foreign-born Jew).

■ In determining whether the published words are reasonably capable of such a meaning, the courts must look to the words themselves and are not bound by the plaintiff's interpretation of them. If the words do not reasonably have the meaning the plaintiff ascribes to them, the court must disregard the latter interpretation. *Dupont Engineering Company v. Nashville Banner Publishing Company,* 13 F.2d 186 (M.D.Tenn.1925).

■ The damaging words must be factually false. If they are true, or essentially true, they are not actionable, even though the published statement contains other inaccuracies which are not damaging. Thus, the defense of truth applies so long as the "sting" (or injurious part) of the statement is true.

> ... it is not necessary to prove the literal truth of the accusation in every

detail, and that it is sufficient to show that the imputation is substantially true, or, as it is often put, to justify the "gist," the "sting," or the "substantial truth" of the defamation....

W. Prosser, *Law of Torts,* § 116, p. 798 (4th Ed.1971). The question is:

... "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced."

*Memphis Publishing Company v. Nichols,* 569 S.W.2d at 420.

 Since the statement must be factually false in order to be actionable, comments upon or characterizations of published facts are not in themselves actionable. If the published facts being commented upon are true and nondefamatory, the writer's comments upon them are not actionable, even though they are stated in strong or abusive terms. This principle has been given constitutional protection under the First Amendment by the United States Supreme Court. *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978).

In the *Greenbelt Cooperative* case the defendant had used the word "blackmail" to describe the plaintiff's negotiating tactics. The court held that the word was not actionable, because it was simply a "vigorous epithet" used to characterize the plaintiff's conduct, factually described in the same article. There the court stated:

It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable....

398 U.S. at 14, 90 S.Ct. at 1542.

In the *Old Dominion Branch* case the defendant had posted a notice describing the plaintiff as a non-union member and, therefore, among other things, "a traitor to his God, his country, his family, and his class." The court held that the latter characterizations, and other like them, were nonactionable:

The definition's use of words like "traitor" cannot be construed as representations of fact.... "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts." ... "... *However, pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.*" (Emphasis supplied.)

418 U.S. at 284, 94 S.Ct. at 2781.

In its recent revision of the chapters on libel in the *Restatement (Second) of Torts,* the American Law Institute adopted the following principle regarding expressions of opinions:

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

*Restatement (Second) of Torts* § 566 (1977). The ALI formulated a distinction between two types of expressions of opinion, one which is not actionable and the other which is:

... A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on ·

disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication. In the first case, the communication itself indicates to him that there is no defamatory factual statement. In the second, it does not, and if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability. . . .

*Restatement (Second) of Torts* § 566 Comment c, p. 173 (1977).

The *Restatement* gives illustrations applying the foregoing principles:

A says to B about C, a city official: "He and his wife took a trip on city business a month ago and he added her expenses in as a part of his own." B responds: "If he did that he is really a thief." B's expression of opinion does not assert by implication any defamatory facts, and he is not liable to C for defamation.

A writes to B about his neighbor C: "I think he must be an alcoholic." A jury might find that this was not just an expression of opinion but that it implied that A knew undisclosed facts that would justify this opinion.

*Restatement (Second) of Torts* § 566, p. 174 (1977).

Obviously, the ALI based the principles of § 566 on the supreme court's rulings in *Greenbelt Cooperative, Old Dominion Branch,* and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Gertz* the court stated:

. . . Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. . . .

*Id.* at 340, 341, 94 S.Ct. at 3007.

■ The holdings in *Greenbelt, Old Dominion* and *Gertz* together are regarded by

the ALI as having the effect of holding that the First Amendment will not permit recovery in defamation for a statement which is the mere expression of an opinion and which does not assert by implication the existence of underlying false, defamatory facts. *Restatement (Second) of Torts* § 566 comment c (1977). In other words, it is now a matter of constitutional law that statements of opinion or characterizations based upon disclosed nondefamatory facts are not defamatory even though they are stated in strong or abusive terms.

■ In light of the above authority we agree with the defendant's contention that the statements in question are not actionable as a matter of constitutional law since they are characterizations or opinions based on nondefamatory facts published in the letter. For example, the headline in *The Press* stating: "Bickford Family Protests Auto Rip-Off" and the statement: "Here is a perfect example of highway robbery in action," while likely harmful to plaintiff, do fit the rationale of § 566 and the *Greenbelt* and *Old Dominion* cases. The headline appears to be Mr. Bickford's comment on or opinion of the series of transactions thereafter described in his letter. Similarly, the "highway robbery" statement can be classified as Mr. Bickford's characterization of the circumstances surrounding the trade-in of the 1972 Datsun for the 1979 model. The other statements about which plaintiffs complain are either true or clearly nondefamatory or both. *See* pages 718–719, *supra.*

In our view plaintiffs' reliance on *Memphis Publishing Co. v. Nichols, supra,* is misplaced. We recite the facts in that case. The *Memphis Press Scimitar* reported in a news article that Mrs. Ruth Nichols was shot in the arm by an unidentified woman after the suspect came to the Nichols' home and found her husband there with Mrs. Nichols, explaining that the suspect first fired at her husband and then shot Mrs. Nichols. The suspect turned out to be a Mrs. Newton, and the undisputed proof

showed that the shooting occurred at 3 p.m. in the Nichols' home, and that in addition to Mrs. Nichols and Mr. Newton, Mr. Nichols and two other neighbors were present and all were in the living room talking at the time of the shooting.

Mrs. Nichols alleged that the article implied that she was having an affair with Mr. Newton, and sued the newspaper for defamation. The newspaper claimed truth as a defense and its motion for a directed verdict was granted by the trial court. This court reversed and remanded for a new trial. Our supreme court affirmed, saying:

> ... In our opinion, defendant-newspaper's motion for a directed verdict in this case must be resolved in favor of Mrs. Nichols. When read and construed in the sense in which the reader would ordinarily understand it, the clear implication of the article is that Mrs. Nichols and Mr. Newton had an adulterous relationship and were discovered by Mrs. Newton, thus precipitating the shooting incident. If so read, it can hardly be doubted that Mrs. Nichols' reputation would be injured.

*Id.* at 419.

We do not believe *Nichols, Greenbelt, Old Dominion* and § 566 of the *Restatement* are in conflict. *Nichols* deals with factual accuracy, holding that the factual meaning of a statement can be falsified by omitting material facts. This principle is well established in the law of libel and misrepresentation. *Greenbelt, Old Dominion* and § 566 of the *Restatement,* on the other hand, deal with the problem of opinion or characterization. The thrust of these authorities is that an opinion is not actionable as libel unless it implies the existence of unstated defamatory facts. As long as the true facts on which the opinion is based are published, the opinion itself is not actionable.

There is no *Nichols* problem in this case, since the facts stated in the Bickford letter do not defame the defendant, and the letter does not state any false or disputed facts which affect the essential factual meaning of the letter. In *Nichols* material facts

were omitted which changed the factual meaning of the article. The *Nichols* article failed to mention the presence of the plaintiff's husband and others, thereby misrepresenting a neighborhood gathering as a private meeting between the plaintiff and her assailant's husband. No such factual distortion can be claimed to exist in this case.

The comments and characterizations involved here, such as "pure highway robbery" and "rip-off," fit precisely the rationale of *Greenbelt, Old Dominion* and § 566 of the *Restatement.* These are clearly characterizations of the facts set forth in the letter, and do not imply the existence of undisclosed defamatory facts. Thus, these authorities are controlling. *See also Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir. 1978) (use of the word "swindle" to characterize the plaintiff's violation of Michigan's Blue Sky law, while "ill chosen" held not actionable); *Fram v. Yellow Cab Co. of Pittsburgh,* 380 F.Supp. 1314, 1329 (W.D.Pa. 1974) (statement that the plaintiff's previous statements reflect "the sort of paranoid thinking that you get from a schizophrenic" held not actionable, because it would be understood as mere "rhetorical hyperbole"); *Reoux v. Glenn Falls Post Co.,* 18 Misc.2d 1097, 190 N.Y.S.2d 598, 600–01 (N.Y.Sup.Ct. 1959) (statement that plaintiff's refusal to tell a court the whereabouts of certain money was "contumacious conduct" was not actionable, because it simply expressed an opinion that the plaintiff was "stubborn or contrary or obstinate or disobedient"); *Schy v. Hearst Pub. Co.,* 205 F.2d 750 (7th Cir. 1953) (charging the plaintiffs with "gestapo-like" tactics not actionable, because it was merely "a somewhat rhetorical way of saying that their conduct was dictatorial"); *Bleecker v. Drury,* 149 F.2d 770 (2nd Cir. 1945) (statement that a lawyer had committed "a fraud upon the court" was merely a "bombastic characterization of the plaintiff's maneuvers" in representing his client, and was not actionable as libel); *Williams v. Rutherford Freight Lines, Inc.,* 10 N.C. App. 384, 179 S.E.2d 319, 323 (1971) (statement in the course of a labor dispute that the plaintiffs were "gangsters"

is "nothing more than vituperation or name calling" and is not actionable); *Heft v. Burk,* 302 So.2d 59, 60 (La.App.1974) (statement that the plaintiff was "pirating" employees away from the defendant and that his actions were "totally unethical" merely expressed the defendant's strong opinion concerning the plaintiff's attempts to hire employees away from him, and were not actionable); *Brown v. Newman,* 224 Tenn. 297, 454 S.W.2d 120 (1970) (statement "have the skids been greased at city council?" not actionable).

The plaintiffs argue that the existence of numerous disputed material facts renders discussion of § 566 of the *Restatement* and the *Greenbelt* and *Old Dominion* cases a moot question. In particular, they claim there are 27 statements in the subject letter which are false and which raise disputed issues of material facts. However, in their brief only five are identified. Plaintiffs state that there were only two true facts stated in the letter: that Mr. Bickford had a daughter, and that she had purchased a car from the plaintiff dealership. We cannot agree. After a careful review of the record, we conclude that the alleged factual disputes identified by the plaintiffs are either (1) immaterial to their libel claim, in the sense that they would not significantly affect the average reader's understanding of the transaction being described, and certainly do not affect the "gist," "sting" or "substantial truth" of the writing, *see* W. Prosser, *Law of Torts,* § 116, *supra,* or (2) are nonexistent, in that they are not statements of fact at all but expressions of opinion.

Although we agree with the defendants' position that the *Restatement (Second) of Torts* § 566 and the supreme court's opinions in *Greenbelt* and *Old Dominion* are controlling in the instant case, we do so with some reservation. We have no problem concurring with the above authority when the context of the characterizations or opinions is clear and reasonable. However, we are not sure that there should not be some inquiry into the reasonableness of characterizations or opinions as they appear in the context of a communication as a whole.

We believe that there must be struck a balance based upon reason between protection of First Amendment rights of the press, which are fundamental to the preservation of our democracy, and the rights of individuals and entities not to be mistreated therein.

For example, we question whether there should be constitutional protection given in circumstances wherein the whole import and impact of a print or electronic media communication is biased and intended to cause harm even though somewhere in an article or program, as the case might be—if one looks or listens carefully enough—all the material facts—as opposed to characterizations—can be found. Our courts have no problem in determining that there is no constitutional protection and a cause of action exists where, even though all essential facts that are reported are true, material facts are omitted which, if disclosed, would change the meaning and comprehension of a communication. *See Memphis Publishing Co. v. Nichols, supra.* Likewise, we believe a strong argument can be made that relief should be afforded an offended party where even though *all* material facts are disclosed they are themselves set forth in a misleading fashion.

There is a fairly thin line between constitutionally protected comment and characterization as set forth in § 566 of the *Restatement, supra,* and the *Memphis Publishing Co. v. Nichols, supra,* situation where the reported facts were true, but misleading since not all material facts were given. There is even a finer distinction that may need to be drawn in situations where all material facts are true and are set forth in some fashion in a media-communication—but where the commentary is skillfully and purposely so slanted that grasping all the factual truths and separating them from the commentary is more than can be expected of the proverbial "reasonable man."

The slanting of communications (especially by the print media) can be accomplished by highlighting facts unfavorable to a subject and burying those more favorable through the use of devices such as derogato-

ry headlines, harsh and overemphasized lead paragraphs, selective front and back-page reporting and taking statements and actions out of context combined with questionable characterizations.

The headline used by *The Press* in the instant case, "Bickford Family Protests Auto Rip-Off" standing alone could well be exemplary of such devices. Obviously, the characterization is highlighted. There is no softening or explanatory wording such as protestation of the "alleged rip-off." Is the headline misleading? If so, is that fair? The questions are rhetorical as under existing law we find the entire letter and its headline to be constitutionally protected and not actionable.

The judgment of the trial court is affirmed and this cause is remanded. The costs are taxed against plaintiffs.

AFFIRMED AND REMANDED.

LEWIS, J., concurs.

TODD, P.J., Middle Section, concurs in a separate concurring opinion.

TODD, Presiding Judge, concurring.

I fully concur in that part of the principal opinion which deals with the non-liability of the Mid-South Publishing Company, Inc., d/b/a The Daily News Journal.

I concur in the result reached in respect to Donald H. Keith d/b/a The Press, but only on the basis that the plaintiff failed to offer satisfactory evidence that the publication was capable of interpretation in a defamatory, i.e., libelous meaning. I cannot agree that a newspaper is entitled to a summary judgment where it prints a non-libelous letter under a libelous headline.