Wendy A. WOODRUFF, Plaintiff–
Appellee Cross–Appellant,

v.

Dennis E. OHMAN, Ph.D, Individually
and as Associate Professor and Di-
rector of the Ohman Laboratory and
the Department of Microbiology, Uni-
versity of Tennessee, Memphis, Defen-
dant–Appellant Cross–Appellee,

and

University of Tennessee at
Memphis, Defendant.

Nos. 99–6037, 99–6128.

United States Court of Appeals,
Sixth Circuit.

Feb. 6, 2002.

**338**

Before KEITH, BATCHELDER, and, MOORE Circuit Judges.

BATCHELDER, Circuit Judge.

Defendant Dennis Ohman appeals the order of the district court, following a bench trial, entering judgment in favor of the plaintiff, Wendy Woodruff, on Woodruff's claims of gender discrimination and retaliation, awarding punitive damages and injunctive relief and ordering Ohman to apologize to Woodruff. Woodruff cross-appeals the district court's order dismissing Woodruff's state law defamation claim against Ohman. For the reasons that fol-

low, we will remand this matter for further proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Wendy Woodruff brought this action in May 1993, in federal court against Dennis Ohman and Terrance Cooper in their individual and official capacities as faculty members of the University of Tennessee (UT). The complaint raised claims of gender discrimination, retaliation and deprivation of liberty and property under 42 U.S.C. §§ 1983 and 1985, and state law defamation. Woodruff subsequently amended her complaint to add claims of gender discrimination and retaliation under Title VII, 42 U.S.C. § 2000e-(2)(a) and 2000e-(3)(a), and to add UT as a defendant as to all claims except the state law defamation claim.

Ruling on motions to dismiss filed by all defendants, the district court dismissed the Title VII claims against Ohman and Cooper in their individual capacities on September 29, 1993. In that same order, the district court held that the Eleventh Amendment barred Woodruff's § 1983 claims against the defendants in their official capacities for monetary damages.[1] Ohman later moved for summary judgment on the § 1983 claim on the grounds that the only avenue available to Woodruff to seek relief for gender discrimination and retaliation was Title VII. In an order entered on September 3, 1996, the district court denied the motion, holding that while claims for retaliation are exclusively remediable under Title VII, claims for gender discrimination are equal protection claims and are properly brought under § 1983. In that order the court also dismissed Woodruff's § 1983 claim for deprivation of

---

1. The parties have included in the Joint Appendix only Ohman's motion to dismiss. That motion mentioned the Eleventh Amendment only with regard to Ohman in his offi-

cial capacity, and we interpret the ensuing order to dismiss the § 1983 claims for monetary damages only as to the defendants in their official capacities.

property, noting that Woodruff had conceded that she had no cognizable property interest in her continued employment.

The remaining claims were tried to the bench in September of 1996. At the conclusion of Woodruff's case-in-chief, the court granted Ohman's Ore Tenus Motion for Judgment as a Matter of Law dismissing Woodruff's state law defamation claims. The court ruled that under Tennessee law Woodruff (a post-doctoral research assistant) was a public figure, and that she had failed to show, by clear and convincing evidence, that Ohman had libeled her with malice.

On September 30, 1998, the district court entered a Memorandum and Opinion finding, as best we can discern, that: Woodruff was entitled to judgment under Title VII against Ohman and UT for retaliation and gender discrimination; Ohman and UT were entitled to judgment on the § 1983 gender discrimination claim because Title VII was the exclusive avenue for relief on the gender discrimination claim;[2] Ohman was entitled to judgment on the § 1983 claim for deprivation of liberty because Ohman's actions were not the cause of Woodruff's termination; and Ohman and UT were entitled to judgment on the § 1985 conspiracy claim because there was no evidence of conspiracy. The court ordered relief on the Title VII claims in the form of back pay, front pay, compensatory damages, reimbursement of medical expenses, attorney's fees and expenses, an injunction against Ohman and UT against future discrimination and retaliation, and a written apology from Ohman to Woodruff. As part of the order of back pay, the court included the following:

> Plaintiff has prevailed on the claim of sex discrimination under the Equal Protection Clause. Her injuries have been compensated in the above awards of back pay and compensatory damages. However, Plaintiff is also entitled to punitive damages under 42 U.S.C. § 1983 for the deliberate and malicious actions of Defendant Ohman.

> Clearly, Ohman's actions were malicious with an intent to harm Plaintiff personally and professionally. In order to punish Dr. Ohman for those actions, an award of $50,000 is appropriate.

The order concludes with the finding that "Dr. Dennis Ohman and the University of Tennessee, Memphis are liable under Title VII for gender discrimination and retaliation against Dr. Woodruff as set forth in this order."

The district court subsequently referred to the magistrate judge all post-trial matters including, among other things, the determination of attorney's fees. By order entered on July 7, 1999, the court adopted the magistrate judge's report and recommendation. Included in the district court's order adopting the report and recommendation is this statement: "The Parties vigorously tried this sex discrimination claim under § 1983. Defendant Ohman tried the issue and was found liable for damages."

On appeal, Ohman challenges any judgment finding him liable for gender discrimination; he appeals as well the award of punitive damages, the order that he apologize to Woodruff and the grant of injunctive relief. Woodruff cross-appeals, challenging the district court's dismissal of her defamation claim against Ohman.

## FACTUAL BACKGROUND

---

**2.** Appended to the ruling on the § 1983 claim are the words: "See section IV.A.2. infra."

The order contains no section IV.A.2.

The one thing that is clear in this case[3] is that Dr. Wendy Woodruff and Dr. Dennis Ohman do not get along. Both are molecular biologists, ostensibly looking for a cure for cystic fibrosis. Woodruff, a Canadian citizen who earned her Ph.D. in Microbiology at the University of British Columbia, began a post-doctoral fellowship at UT working with Dr. Ed Beachy. Beachy, however, died shortly after Woodruff began working with him, and Woodruff was invited to join the research team headed by Ohman. Ohman was receiving grant money from the National Institutes of Health (NIH).

At the beginning of their collaboration in 1989, Woodruff and Ohman submitted a joint application to the Medical Research Council of Canada (MRC) for another grant. The dispute before us in this case has its origins, at least in part, in that grant, which was one of the sources of Woodruff's salary at UT. Woodruff wanted a salary equivalent to those received by the two post-doctoral fellows–both male– who worked under Ohman. Further, Woodruff insisted, and Ohman agreed, that Woodruff would be named a "research associate" rather than a post-doctoral fellow. According to the record, the two positions are essentially identical in terms of job duties, but "research associates" are full-time employees of the University and thus subject to University leave policy and eligible for benefits, while "post-docs" are not. Woodruff and Ohman agreed that Woodruff would receive part of her salary from UT and part from the MRC grant.

Ohman assigned Woodruff to clone certain gene sequences to aid in their research. Woodruff claims that she voiced concerns in 1990 and 1991 that there were serious problems with Ohman's plan to clone these sequences. Ohman responded that Woodruff was unproductive in completing her cloning. To further exacerbate the problem, Woodruff claimed her research did not support the hypothesis proposed by Ohman, while Ohman claimed that Woodruff was singularly unproductive and had produced no outline or draft of a publishable paper. The relationship suffered a breakdown in October of 1991, when Woodruff confronted Ohman regarding his adding to those working on Woodruff's project a female graduate student whose research apparently supported Ohman's. Tempers flared, and Ohman told Woodruff to leave his office.

On April 30, 1992, Ohman received a letter from the MRC stating its intention to renew Woodruff's fellowship for a third year and increase her stipend. Ohman was concerned that Woodruff was receiving a salary stipend from two sources in violation of UT policy and he thought that her MRC salary was alone enough to support her. He drafted a memo to Woodruff listing his concerns regarding her salary and took it to Dr. Terrance Cooper, Chair of the Microbiology and Immunology Department. Contrary to Cooper's instructions, Ohman presented the memo to Woodruff without attempting to verify the accuracy of the information.

After receiving the memo, Woodruff immediately contacted Cooper and complained that Ohman's figures were not accurate and that Ohman was not providing her with proper mentoring and supervision. Cooper told Woodruff about the potential violation of UT policy and asked her to discuss the matter with Ohman and return to Cooper with whatever informa-

**3.** We highlight the facts–gleaned from the lengthy factual narrative detailed in the district court's opinion, the record of the case and the parties' briefs–necessary to this opinion.

tion or calculations she had supporting her position.

When Ohman did not hear from Woodruff by the end of the day on April 30, he prepared a copy of his memo on UT letterhead, and addressed it to Harold Finn, Assistant Chair of the Department of Microbiology and Immunology. He prepared another memo to Finn directing that Woodruff's status be changed from "research associate" to "post-doc" and that she receive no salary from Ohman's NIH grant. Ohman placed copies of the memos on Woodruff's desk.

Woodruff immediately arranged a meeting with Finn, and Jim New, the Assistant Dean of the College of Medicine. New asked Woodruff what might prompt Ohman to change the salary arrangements that had been effect for the past two years. Woodruff responded that it might have been because she refused Ohman's sexual advances.[4] New suggested that Woodruff meet with JoAnn Cutting in UT's legal counsel office. Woodruff was one step ahead of New, having already contacted the legal office with a question regarding how the salary change would impact her immigration status. She met with Cutting and discussed her sexual harassment allegation, her claims of "scientific misconduct," as well as her immigration status. On the advice of Cutting, Woodruff also contacted Bettie Puckett, UT's Director of Affirmative Action, to discuss her sexual harassment claim. On May 4, 1992, Cutting notified Woodruff that per order of the dean of the medical school, her salary would not be reduced. Woodruff subsequently requested that the University investigate her harassment claim. Her "scientific misconduct" claim was investigated

by Dr. Jewell Ward, who determined that Ohman had not acted improperly.

As the investigation was proceeding in May of 1992, Ohman received information from Dr. Daniel Hassett, an instructor with whom Woodruff worked, that Woodruff was considering legal action against Ohman. Also in early May, Finn and Cooper contacted Ohman to let him know that Woodruff's salary would remain intact.

On May 25, Ohman wrote a letter to the MRC claiming that Woodruff had retained counsel in regard to the salary dispute and was threatening to sue Ohman and UT, and describing Woodruff as "unproductive." He asked the MRC to reconsider its renewal of Woodruff's fellowship. Ohman wrote to the INS the same day, advising that Woodruff lacked the skills he thought she had when he hired her, and withdrawing his support for her application for permanent residency.

Ohman held a meeting with his laboratory staff on June 1. A main topic at this meeting was how to improve Woodruff's productivity. One of Ohman's strategies was to move Woodruff and Hassett–who, unbeknownst to Woodruff, had been a vital source of information to Ohman regarding Woodruff's plans to bring suit against Ohman and UT–to another lab down the hall. Two days later, Woodruff sent a letter to Ohman indicating that the lab to which she was newly assigned was not properly equipped. Woodruff requested a number of items she claimed were necessary to her work and asked that the lab be certified for radioactive use. Despite Cooper's directing Ohman to provide Woodruff with the equipment she requested, Ohman did not order the items, maintaining that Woodruff could use equipment in the other

---

4. The record contains no evidence that any sexual advances or sexual harassment actually occurred. Rather, the parties stipulated that Woodruff perceived that she was sexually harassed by Ohman during 1989 and 1990, and that Ohman denied that he had sexually harassed her.

lab, which was down the hall. Meanwhile, after receiving a letter from Woodruff detailing her allegations against Ohman, University officials met in early June and determined that, while Ohman's actions did not merit termination, they did warrant further investigation and possible reprimand.

As the new school year began in September of 1992, Woodruff met with Cooper and Ohman to review her as yet unfilled request for equipment. A compromise was reached whereby Cooper would determine which items requested by Woodruff were not duplicative of other equipment, or too expensive, and Ohman would order the equipment.

In mid-September, Woodruff traveled to Canada for her brother's wedding. Upon her return to UT, roughly a month later, she discovered that Ohman had canceled the equipment orders for her lab. Woodruff contacted Finn's office and notified him that she was going to be taking some time off. She was gone until mid-December, during which time she worked on a project in Milwaukee and one at the University of North Carolina. While in North Carolina, Woodruff applied for a fellowship there. Apparently she had not left any address with her colleagues at UT indicating where she could be reached during these two months, although during November. Woodruff wrote to Cooper saying that she had been advised to spend some time away from the department to recover from the recent stress.

Cooper reached Woodruff on December 4, and notified her that her leave had expired, and that UT officials had been trying to locate her. UT sent Woodruff the paperwork to request a leave of absence without pay. Woodruff responded to Cooper that she did not think UT policy required her to request leave to cover time spent interviewing but requested leave through December 30. Woodruff also complained that male post-doctoral assistants in Ohman's lab had been permitted to interview without using leave time.

Woodruff returned to UT in December 1992, and filed an EEOC charge against Ohman, claiming sexual discrimination and retaliation. On December 24, she went to her lab only to discover that all her equipment had been removed from the lab and her notebooks had been dumped on her desk. A memo she found on her desk confirmed that it was Ohman who had removed all of her equipment for security reasons. Woodruff also found that the locks to Ohman's lab had been changed. Again, Woodruff and New arranged meetings to discuss how to create a more productive environment.

As it happened, however, Woodruff's application for permanent residency in the United States had been denied on June 11, 1992, because she had allowed her former visa to lapse, making her out of "lawful status" at the time of her application. She was ordered to leave the United States. Her request for reconsideration was denied in October 1992, and she was again ordered to leave the country. In early January 1993, UT was notified by the INS that Woodruff's employment authorization had been revoked. In light of the INS revocation of the work permit, UT could no longer lawfully employ Woodruff and on January 5, 1993, UT discharged her.

Woodruff returned to Canada where she allegedly suffered physical and emotional problems related to her difficulties at UT. She eventually accepted a one-year position as a visiting scientist at the University of Alabama at Birmingham which ended in 1996.

## ANALYSIS

We review for clear error the district court's findings of fact after a bench trial;

we review de novo the court's conclusions of law. *Burzynski v. Cohen,* 264 F.3d 611, 616 (6th Cir.2001).

### Gender discrimination

Prior to trial, the district court dismissed Woodruff's Title VII claims against Ohman in his individual capacity and Woodruff's § 1983 claims against Ohman in his official capacity and UT. Those rulings are not challenged here. Although the conclusion of the order entered by the district court after the bench trial declares that "Ohman and the University of Tennessee, Memphis are liable under Title VII for gender discrimination and retaliation," as to Ohman we construe it as a judgment against him in his official capacity only. *See Wathen v. General Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997).

 The district court also held at the conclusion of the trial, citing *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984), that Title VII provided the exclusive remedy for Woodruff's gender discrimination and retaliation claims; the court therefore dismissed the § 1983 claim in its entirety. That conclusion is correct only as to Woodruff's claim of retaliation. As *Day* makes clear, Title VII provides the exclusive remedy only with regard to those rights that are secured by Title VII but are not protected independently of Title VII by the Constitution. *Id.* at 1204. Therefore, we conclude that the district court erred in dismissing Woodruff's § 1983 gender discrimination claim on that basis.

 Despite having explicitly held that Woodruff's § 1983 claim was dismissed because Title VII provided the exclusive remedy, the district court also held that:

> Plaintiff has prevailed on the claim of sex discrimination under the Equal Protection Clause. Her injuries have been compensated in the above awards of back pay and compensatory damages. However, Plaintiff is also entitled to punitive damages under 42 U.S.C. § 1983 for the deliberate and malicious actions of Defendant Ohman.
>
> Clearly, Ohman's actions were malicious with an intent to harm Plaintiff personally and professionally. In order to punish Dr. Ohman for those actions, an award of $50,000 is appropriate.

Although punitive damages are permissible under § 1983, they cannot be awarded independent of a judgment of liability under that section. Further, the district court awarded Woodruff back pay, front pay, compensatory damages for "emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses" on her claim under Title VII as amended by 42 U.S.C. § 1981a(a)(1). While Woodruff was, as we have explained, entitled to pursue her gender discrimination claim under both Title VII and § 1983, she is not entitled to recover twice for the same loss. *See General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 333, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) ("It also goes without saying that the courts can and should preclude double recovery by an individual".); *see also Johnson v. Howard,* No. 99–2353, 2001 WL 1609897, at *1, 24 Fed.Appx. 480 (6th Cir. Dec. 12, 2001) (unpublished) ("A party is not entitled to recover twice for the same loss, even if the party would otherwise be able to recover for that loss under separate theories of liability."). And an award of punitive damages under § 1981a would not appear to be available against Ohman for the same reason that he cannot be held individually liable on the Title VII claim.

Ohman contends on appeal that–whatever the theory on which Woodruff is proceeding–the evidence simply does not support the district court's judgment that

Ohman discriminated against Woodruff on the basis of her gender. This court has ruled that the showing a plaintiff must make is identical under Title VII and § 1983. *Grano v. Dep't of Dev. of the City of Columbus*, 637 F.2d 1073, 1082 (6th Cir.1980). In essence, the plaintiff must show that she was the victim of purposeful discrimination because of her gender. *Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004, 1011 (6th Cir.1987).

The district court held that Woodruff had succeeded in making out a prima facie case of gender discrimination by presenting evidence that she was a member of a protected minority group, she was adequately qualified for her position, and she was treated differently from similarly situated males. The court held that the male post-docs were similarly situated in all relevant respects because, although they, unlike Woodruff, were not UT employees, did not receive benefits and were not subject to UT leave policy, the nature of the work they performed was the same as that of Woodruff. The district court looked no further. In particular, the district court made no findings with respect to whether either of those male post-docs was treated differently than Woodruff for "the same or similar conduct." *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992).

■ Even assuming that Woodruff's evidence was sufficient to make the prima facie case of gender discrimination, however, the district court's memorandum opinion wholly fails to provide a sufficient basis for its finding of gender discrimination. The court correctly stated the applicable law: once the plaintiff establishes the prima facie case, the defendant must present evidence of a legitimate, non-discriminatory reason for the adverse action; if the defendant does so, the presumption of discrimination drops out of the case and the burden of production shifts to the plaintiff

to prove by a preponderance of the evidence that the defendant's articulated reason is pretextual. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden of persuasion is not affected by this shifting burden-of-production scheme. *Id.* The district court correctly noted that this circuit has held that in order to demonstrate pretext, the plaintiff may produce evidence that the defendant's proffered reason had no basis in fact, that the proffered reason was not sufficient to justify the adverse action taken against the plaintiff or that the proffered reason did not actually motivate the adverse action taken. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (citing *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993)). Subsequent to the district court's judgment in this case, the Supreme Court expounded on its earlier ruling in *Hicks* that an employment discrimination plaintiff must demonstrate both that the employer's proffered reason for the adverse action is false and that the real reason is discrimination. *See Hicks*, 509 U.S. at 515. In *Reeves v. Sanderson Plumbing Prod., Inc.* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court explained that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148 (italics added). The Court made it clear, however, that it was not retrenching on *Hicks'* s requirement that it is not enough for the plaintiff merely to prove that the employer's explanation is not worthy of belief; the plaintiff must still prove that the true reason is discrimination. *Id.* at 147. Quoting from *Hicks*, the Court reiterated:

The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a

suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Id.* (quoting *Hicks*, 509 U.S. at 511).

This district court here made extensive findings of fact with regard to its conclusion that Ohman's actions were retaliatory,[5] but with regard to its conclusion that Ohman's actions were motivated by gender discrimination, the court said only:

> Ohman admits that he provided Wozniak with the support and guidance that a mentor is expected to provide a post-doctoral fellow. Ohman did not mentor Woodruff, undermined her efforts, imposed more stringent requirements on her, and denied her similar benefits to post-doctoral fellows. Woodruff has proven that Ohman treated her differently. This disparate treatment the court finds was gender based. The difference between the way that Ohman treated Woodruff and the male post-doctoral fellows is further attributable to Ohman's ongoing discrimination and retaliation against Woodruff. Discriminatory purpose "implies that the decision maker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of its adverse effects upon an identifiable group." Because there has been a showing that Woodruff's gender was the motivating factor for the difference in the way that she was treated by Ohman and UT, are liable to her as to this claim [sic].

Memorandum Opinion and Order, p. 40 (citation omitted).

The district court apparently disbelieved Ohman's proffered explanations for every adverse action of which Woodruff complains. But the district court held that those actions were motivated by Ohman's desire to retaliate against Woodruff for complaining to UT for his alleged sexual harassment of her. That conclusion is both supported by the record and adequately explained in the court's Memorandum Opinion and Order. Discrimination motivated by retaliatory intent, however, is not the same thing as discrimination because of gender. In order to find Ohman's conduct gender-based, the court was required to point to some evidence to demonstrate, not only that Ohman's explanations were false, but that Ohman in fact treated Woodruff as he did because of her gender.

In *Reeves*, the Court said "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other nondiscriminatory reason for the employer's decision." *Reeves*, 530 U.S. at 148. We think the same principle would apply if the record conclusively revealed that the actual reason was discrimination but of a kind other than that alleged by the plaintiff. In the case before us here, the only basis for the claim that the discrimination was gender-based is the different treatment of the two male post-docs and the admittedly unsubstantiated allegation of sexual harassment. The record contains no evidence that there actually was any sexual harassment. That leaves only the different treatment of the two males, and the court gives no explanation for concluding that the different treatment alone is enough to support an inference that its cause was Woodruff's gender. Certainly it is not sufficient for the court

---

**5.** The judgment in favor of Woodruff on her claims of retaliation under Title VII is not challenged on appeal.

to reason in a circle by saying that the disparate treatment was gender-based, that the disparate treatment was further attributable to discrimination and retaliation, and that discriminatory purpose is demonstrated by its adverse effects upon Woodruff.

We cannot determine from the district court's order the basis for its judgment of liability on the gender discrimination claim under Title VII or what it intended with regard to Woodruff's § 1983 claim for gender discrimination. Neither are we able to determine the basis upon which the court awarded punitive damages. Accordingly, we will vacate the judgment against Ohman for gender discrimination under Title VII and for punitive damages, and remand to the district court for further proceedings consistent with this order.

### District Court Order That Ohman Apologize

■ The extent of the district court's exercise of equitable powers is reviewed for an abuse of discretion. *Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1118 (6th Cir.2001). Here, the district court exceeded its equitable power when it ordered Ohman to apologize. As the Ninth Circuit noted when faced with a similar situation "[w]e are not commissioned to run around getting apologies." *McKee v. Turner*, 491 F.2d 1106, 1107 (9th Cir.1974).

While courts have "broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs," *Smith v. Town of Clarkton*, 682 F.2d 1055, 1068 (4th Cir.1982), that authority is limited by the authority or purpose pursuant to which the equitable power is exercised. Thus, federal courts must "exercise 'the least possible power adequate to the end proposed.'" *Spallone v. United States*, 493 U.S. 265, 280, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (quoting *Anderson v. Dunn*, 19 U.S. (6

Wheat.) 204, 231, 5 L.Ed. 242 (1821)). Here, the district court found that money alone could not remedy the damage caused by Ohman's "reprehensible" conduct. The purpose of the forced apology was undoubtedly to make Woodruff whole in a sense not usually taken into account in the law. That sense is righting moral wrongs. The law, however, is not usually concerned with procuring apologies to make morally right a legal wrong done to the plaintiff. In the specific context of gender discrimination and retaliation, an apology will little serve the purposes of Title VII. The apology will not provide any remedy to Woodruff for which the damages imposed have not already accounted. Neither the district court nor Woodruff cites to any authority, and we have found none, that would permit a court to order a defendant to speak in a manner that may well contravene the beliefs the defendant holds. We conclude that the district court abused its discretion in ordering Ohman to issue an apology to Woodruff.

### Injunctive Relief

Woodruff concedes in her brief that the issue of injunctive relief against Ohman in his individual capacity is moot. Accordingly, we remand this matter to the district court with instructions to vacate that portion of the judgment. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40, 71 S.Ct. 104, 95 L.Ed. 36 (1950) (holding that where a civil case has become moot pending appeal, the duty of the appellate court is to reverse or vacate the judgment below and remand with instructions to dismiss.); *see also Goldwater v. Carter*, 444 U.S. 996, 1005, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Rehnquist, J., concurring).

### Woodruff as a Public Official

The district court granted Ohman's motion for judgment as a matter of law under Rule 52(c) on Woodruff's defamation claim,

finding that, under Tennessee law, Woodruff was a public official and Woodruff had failed to show that Ohman had acted with actual malice. The district court found that Woodruff (a post-doctoral research assistant) was a public official for defamation purposes not because Woodruff's position affected the "lives, liberty, money or property" of other citizens but because the public had "reposed ... high public confidence" in Woodruff as evidenced by her prestigious and important position.

We review de novo the district court's grant of a motion for judgment as a matter of law. *Tuck v. HCA Health Serv. of Tenn. Inc.*, 7 F.3d 465, 469 (6th Cir.1993). We must consider the evidence in a light most favorable to a non-moving party, *id.*, affirming the grant of the motion only if the evidence is such that reasonable minds would not differ. *Id.*

The issue on appeal here is whether Woodruff was a public figure such that the heightened standard of proof required in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is applicable. If so, Woodruff would be required to plead and show that Ohman acted with actual malice–a knowing or reckless disregard of the truth. *Id.* at 280. The determination of whether a particular person is a public official within the meaning of *New York Times* is a question of law. *Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162, 166–67 (Tenn. 1992) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499–511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)).

In Tennessee the courts have defined a public official as a person who " 'appear[s] to the public to have[ ] substantial responsibilities for or control over the conduct of governmental affairs.' " *Press, Inc. v. Verran*, 569 S.W.2d 435, 441 (Tenn.1978) (quoting *Rosenblatt v. Baer*, 383 U.S. 75,

85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966)). Thus, in Tennessee.

> Any position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family, is a public office within the meaning of the constitutional privilege.

*Id.* Following this admonition courts applying Tennessee law have determined that a public school teacher, *Campbell v. Robinson*, 955 S.W.2d 609 (Tenn.Ct.App.1997), and a state highway patrol officer are public officials, *Roberts v. Dover*, 525 F.Supp. 987 (M.D.Tenn.1981).

We think it is clear that Woodruff, as a post-doctoral research assistant, does not meet the criteria set forth by the Tennessee Supreme Court to qualify as a public official. Even the district court recognized that Woodruff "did not occupy a position of employment that carried with it duties and responsibilities affecting the lives, liberty, or property of a citizen" which the *Verran* Court noted were the defining characteristics of a public official. The district court justified its decision, however, by stating that Woodruff had a position of high confidence and trust. We think that the district court erred in finding that Woodruff's position was one of high confidence and public trust, and in ruling that high trust and confidence are determinative of whether a position is public.

Woodruff's position consisted of aiding Ohman in his research in microbiology. The position she held, not to detract from the importance of the research she aided, was not one meant for the protection of *New York Times*. As already noted, Woodruff's position did not give her the ability to directly affect the lives or liberty of any citizen, and is thus clearly distin-

guishable from that of a highway patrolman whose most important task is to discern whether a person's conduct merited restraining that person's liberty. *Roberts,* 525 F.Supp. at 990. In fact, Woodruff's work and research was largely invisible to the public. This fact clearly distinguishes her position from that of the public school teacher in *Campbell,* who was in a position of authority and represented the government vis-a-vis the students and parents with whom she met. *Campbell,* 955 S.W.2d at 612.

Further, it does not necessarily follow from the mere fact that a position is one of trust and confidence that the official holding that position is a public official. Adjectives such as "trust" and "confidence," used by the district court, have a potentially unlimited scope. The public may have "trust" and "confidence" in officials from the highest position in the executive branch to the lowliest municipal employee. What determines whether an officer is a public official for First Amendment purposes is the presence or absence of "substantial responsibilit[y]" and "control" over governmental processes that affect the lives, liberty and property of citizens. Since a post-doctoral research assistant does not affect the lives, liberty, and property of citizens, and since Woodruff did not control government affairs and was instead in one of the countless public positions that have little direct impact on citizens' lives, the district court's determination that Woodruff was a public official is erroneous. The district court's judgment on this issue is reversed.

## CONCLUSION

Therefore, we **VACATE** the district court's judgment against Ohman individually for gender discrimination under Title VII and for punitive damages; we **VA-CATE** the judgment's grant of injunctive relief against Ohman; we **REVERSE** the judgment dismissing Woodruff's state law defamation claim; and we **REMAND** this case for further proceedings consistent with this opinion.