**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0107n.06
Filed: February 9, 2006

No. 05-5268

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| WENDY WOODRUFF, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| DENNIS OHMAN, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellant.** | ) | |
| _____ | ) | |

Before: SILER, BATCHELDER, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Defendant-Appellant Dennis Ohman, Ph.D., ("Ohman") appeals the district court's order finding him liable for defamation. Plaintiff-Appellee Wendy Woodruff, Ph.D., ("Woodruff") is a microbiologist from Canada who worked in Ohman's laboratory conducting genetic research. Ohman and Woodruff had a dispute regarding Woodruff's salary and other issues, and Ohman sent letters that were critical of Woodruff to Woodruff's funding institution and to the Immigration and Naturalization Service ("INS"). Statements in these letters are the source of Woodruff's defamation claim. Ohman argues that the statements are not defamatory and that the district court erred in granting Woodruff punitive damages. For the reasons discussed below, we **AFFIRM** the district court's judgment in favor of Woodruff.

# I. BACKGROUND

Woodruff, a Canadian citizen, obtained a doctorate degree in microbiology in 1988. In 1989, Ohman invited Woodruff to work in his laboratory at the University of Tennessee, Memphis ("University"). When Woodruff and Ohman began discussing Woodruff's compensation, they agreed to a salary of $27,000.00 per year, to be paid from Ohman's National Institutes of Health ("NIH") grant. Woodruff and Ohman had also applied for a fellowship from the Medical Research Council of Canada ("MRC"), and in the midst of their salary discussions, they found out that the MRC was awarding them the fellowship. Ohman felt that Woodruff's salary would be too high if she received both the $27,000.00 and the MRC funds. In the course of determining how to balance the two funding sources, Woodruff told Ohman that she would only receive part of the MRC funds due to Canadian regulations. Woodruff testified that when she later found out that she would be receiving a larger portion of the MRC fellowship than she first anticipated, she informed Ohman of this fact.

In April 1992, Ohman discovered that Woodruff was receiving more of the MRC funds than he had realized. Ohman was concerned about Woodruff's salary, and he contacted Dr. Terrance Cooper ("Cooper"), the chairman of the microbiology department at the University. Ohman drafted a memorandum to Woodruff stating that she would be removed from his grants due to her high salary, and he showed this memorandum to Cooper when they met to discuss the situation. Acting upon Cooper's advice, Ohman gave a draft of the memorandum to Woodruff on April 30, 1992, and he instructed her to let him know if there were any problems with it. Woodruff and Cooper then met to discuss the situation, and Cooper informed Woodruff that her salary could be in violation of University policy. When he did not get a response from Woodruff, Ohman sent a copy of the memorandum to the assistant chair of the department and requested that Woodruff's status as a

3

research associate be changed to "post-doc" and that her salary from his grant be terminated. The next day, Woodruff told University officials that Ohman had sexually harassed her.

On May 4, 1992, Ohman was informed that the Dean of the College of Medicine ("Dean Summitt") had ordered that no action was to be taken in the salary dispute with Woodruff. On May 7, 1992, Ohman delivered a draft memorandum to Cooper that he intended to be sent to the MRC, and Cooper then gave the memorandum to Dean Summitt. At some point during this time, Ohman began hearing rumors that Woodruff was initiating legal action against him. Ohman sent out two letters — to the MRC and the INS — on May 25, 1992.[1] J.A. at 364 (Letter from Dennis Ohman, Ph.D., to Pat Evans ("MRC Letter")); J.A. at 367 (Letter from Dennis Ohman, Ph.D., to Immigration and Naturalization Service ("INS Letter")). The MRC Letter discussed the issues pertaining to Woodruff's salary, described Woodruff's poor performance,[2] and recommended against renewing Woodruff's fellowship. A copy of the MRC Letter was attached to the INS Letter, which withdrew Ohman's previous support for Woodruff's application for permanent residency. Dean Summitt was displeased with Ohman's actions in sending these letters, and Ohman sent him a letter of apology on August 5, 1992.

In 1992, Woodruff took a leave of absence and spent time conducting research at other laboratories. Woodruff filed a charge with the Equal Employment Opportunity Commission

---

[1]On cross examination, Ohman stated that Cooper had told him that the letter should be sent to the dean "for approval." J.A. at 267 (Trial Tr. at 299) (Ohman Test.). Ohman added material to the letter that was not in the version originally submitted to Dean Summitt.

[2]Shortly after Woodruff began working in Ohman's laboratory, Ohman became concerned about Woodruff's productivity. He hired a graduate student to conduct research in an area similar to that of Woodruff, which caused tension with Woodruff. Ohman testified that Woodruff refused to cooperate with him in his efforts to increase her productivity.

4

alleging sexual discrimination and retaliation on December 21, 1992. On January 4, 1993, Woodruff met with several University administrators to discuss her concerns. During this meeting, the administrators discovered that Woodruff's immigration status was such that the University could no longer lawfully employ her. Woodruff received a termination letter the next day.

Woodruff filed a complaint in the United States District Court for the Western District of Tennessee on May 20, 1993. The complaint included claims filed pursuant to 42 U.S.C. § 1983 that were based upon alleged violations of Woodruff's rights under the Equal Protection Clause, the Due Process Clause, and the First Amendment. Woodruff also brought a claim pursuant to 42 U.S.C. § 1985 and a state-law claim of defamation. On July 14, 1993, Woodruff filed an amended complaint which included claims of sex discrimination and retaliation under Title VII. Cooper and the University filed a motion for partial dismissal, and Ohman filed a motion to dismiss. The district court issued an order denying the motions to dismiss with regard to the § 1985 claim and the defamation claim and dismissing the Title VII claims as to Ohman and Cooper in their individual capacities. The claims for monetary damages pursuant to § 1983 were dismissed pursuant to the Eleventh Amendment.

The district court conducted a bench trial in September and October 1996. On June 12, 1997, the district court granted the defendants' motion for judgment as a matter of law on Woodruff's state-law defamation claim and accompanying demand for punitive damages and denied the defendants' motion for judgment as a matter of law as to Woodruff's claims under § 1983, § 1985, and Title VII. With regard to the defamation claim, the district court held that Woodruff was a public official, and that the statements did not rise to the level of defamation under the actual malice standard. On September 30, 1998, the district court entered an order dismissing all of the claims

5

against Cooper and finding Ohman and the University liable under Title VII for gender discrimination and retaliation. In this order, the district court granted Woodruff relief in the form of back pay and benefits, front pay, compensatory damages, reimbursement of medical expenses, and injunctive relief. Ohman appealed to this court, and we held that the district court erred in dismissing Woodruff's § 1983 claim alleging gender discrimination and that the district court did not demonstrate that the disparate treatment of Woodruff was based on her gender as required in a Title VII action. *Woodruff v. Ohman*, 29 F. App'x 337, 343, 344-46 (6th Cir. 2002). We also reversed the district court's judgment finding that Woodruff was a public official. *Id*. at 347.

As instructed by this court, the district court conducted further proceedings on remand. The district court concluded that "[Woodruff] successfully proved a prima facie case of defamation." J.A. at 76 (Findings of Fact and Conclusions of Law ("Findings of Fact") at 24). The district court further found that Woodruff was entitled to actual damages as well as an award of punitive damages. On November 1, 2004, the district court entered an order granting Woodruff $50,000.00 in compensatory damages and $125,000.00 in punitive damages. J.A. at 81 (Order). Ohman timely appealed this order.

## II. ANALYSIS

### A. Standard of Review

"On an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*. When the factual findings involve credibility determinations, we afford great deference to the district court's factual findings." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (internal citation omitted). We will review de novo the issue of whether the statements could be understood as defamatory (a

6

question of law in Tennessee), and we will review for clear error the issue of whether the statements were in fact defamatory. *See Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978) ("Whether the news article . . . was, in fact, understood by readers in its defamatory sense is ultimately a question for the jury. But preliminary determination of whether the article is [c]apable of being so understood is a question of law to be determined by the court.").

## B. The Statements

The test for establishing a prima facie case of defamation of a non-public figure in Tennessee is as follows:

> [T]he plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.

*Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 580B (1977)); *see also Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978) (adopting § 580B as "the law of this jurisdiction"). "'Publication' is a term of art meaning the communication of defamatory matter to a third person."[3] *Sullivan*, 995 S.W.2d at 571.

"For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation." *Stones River Motors, Inc. v. Mid-South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983). A statement that is merely "annoying, offensive or embarrassing" to the plaintiff is not defamatory. *Id.* Rather, "[t]he words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule," and "[t]hey must carry with them an element 'of disgrace.'" *Id.* (quoting W. PROSSER, LAW OF TORTS, § 111, at 739 (4th Ed. 1971)). The issue of whether a

---

[3]Ohman does not dispute the issue of publication in this case. Br. Appellant at 23 n.4.

statement could be understood as defamatory is a question of law. *Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996), *cert. denied*, 522 U.S. 821 (1997). "In determining whether the published words are reasonably capable of such a meaning, the courts must look to the words themselves and are not bound by the plaintiff's interpretation of them." *Stones River*, 651 S.W.3d at 719. "Allegedly defamatory statements should be judged within the context in which they are made. . . . They should be read as a person of ordinary intelligence would understand them in light of the surrounding circumstances." *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000) (internal citation omitted).

Woodruff bears the burden of proof in establishing defamation. *Memphis Publ'g*, 569 S.W.2d at 420. In order to satisfy this burden, she must prove that the statements were false. *Stones River*, 651 S.W.2d at 719; *Ali v. Moore*, 984 S.W.2d 224, 229 (Tenn. Ct. App. 1998). Truth may be a defense to a charge of defamation, "so long as the 'sting' (or injurious part) of the statement is true." *Stones River*, 651 S.W.2d at 719. "It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true." *Memphis Publ'g*, 569 S.W.2d at 420.

The district court found that seven of the statements in the MRC and INS Letters were defamatory. Although we do not agree with all of the district court's conclusions, we affirm the judgment in favor of Woodruff because some of the statements do meet the standards articulated above. For example, Ohman stated that "[f]or the last 2 and one-half years she has spent on this project, she has not been able to accumulate enough data for a single paper, and is still far from it." J.A. at 365 (MRC Letter). It is reasonable to interpret this statement as defamatory, because, as the district court stated, "[i]t directly injures Plaintiff in her profession, by implying that she is unable

to perform the scientific work at issue and that she is not a competent scientist." J.A. at 73 (Findings of Fact at 21). An individual with Woodruff's level of education and achievement would likely be viewed with contempt if she was not able to perform the basic duties of her job, and this is thus clearly related to her professional reputation.

Ohman asserts that this statement is true. As support, he points to his testimony regarding Woodruff's lack of productivity, and he states that there was no evidence that Woodruff was close to publishing a paper at the time that this letter was sent. Br. Appellant at 26-28. It may be true that Woodruff was unproductive; however, there is evidence in the record that she accumulated sufficient data for a paper. Woodruff testified that they had "already presented [the research] as an abstract" at the time of the letter, and she stated that "I didn't think that I was very far . . . I thought that it was within easy grasp . . ." J.A. at 334 (Trial Tr. at 482) (Woodruff Test.). Furthermore, Woodruff explained that the gene sequence upon which two later papers were based was identified by June 1991, and she "spent the subsequent time fine tuning the sequencing and repeating things." J.A. at 340 (Trial Tr. at 585) (Woodruff Test.). In light of this evidence, the district court's conclusion that this statement is false and defamatory is not clearly erroneous.

We also agree with the district court that Ohman acted with the requisite fault in publishing the statements. As stated in *Memphis Publishing*, Ohman must have at least been negligent in order to be liable for defamation. *Memphis Publ'g*, 569 S.W.2d at 418. "[T]he appropriate question to be determined from a preponderance of the evidence is whether [Ohman] exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it." *Id*. If Woodruff had already presented her research as an abstract, then

Ohman must have known that the above statement was false and that such a statement would harm Woodruff's career.[4]

## C. Punitive Damages

"Unless 'actual malice' is shown, punitive damages are not permitted." *Myers v. Pickering*, 959 S.W.2d 152, 164 (Tenn. Ct. App. 1997) (citing *Memphis Publ'g*, 569 S.W.2d at 421). The Tennessee Court of Appeals explained the actual malice standard as follows:

> The concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure. Rather, it is limited to statements made with knowledge that they are false or with reckless disregard to their truth or falsity. Determining whether a defendant acted with reckless disregard requires the finder of fact to determine whether the defendant "in fact entertained serious doubts as to the truth of his [or her] publication."

*Tomlinson v. Kelley*, 969 S.W.2d 402, 405-06 (Tenn. Ct. App. 1997) (quoting *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 75 (Tenn. Ct. App. 1986)) (internal citations omitted). "The question whether there is sufficient evidence in the record to permit a finding of actual malice is a question of law." *Cobb v. Time, Inc.*, 278 F.3d 629, 637 (6th Cir.) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984)), *cert. denied*, 537 U.S. 878 (2002). "[J]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Id*. (quoting *Bose*, 466 U.S. at 511). In conducting this independent review, "[c]redibility determinations made by the trier of fact are reviewed under a clearly erroneous standard." *Id*.

[4]The district court awarded Woodruff compensatory damages for "her personal humiliation, mental anguish, and suffering . . ." J.A. at 77 (Findings of Fact at 25). Ohman did not challenge in this appeal the amount of the damages awarded, and our holding that Ohman is liable for defamation does not affect the district court's determination as to this issue.

The district court concluded that Ohman acted with sufficient recklessness to justify awarding Woodruff punitive damages. J.A. at 78 (Findings of Fact at 26). We agree. At trial, Ohman "testified that he felt he had 'a[n] ethical, and moral, and perhaps even legal obligation' to send both letters." J.A. at 78 (Findings of Fact at 26). Yet, in his August 5, 1992, letter of apology to Dean Summitt, Ohman "explains having sent the MRC letter by referrring to the threat of litigation that he felt every day, his state of fear, and the demoralization of his laboratory's personnel, not because of any ethical, moral, or legal obligations." J.A. at 78 (Findings of Fact at 26). *See also* J.A. at 369 (Letter from Ohman to Dean Summitt dated Aug. 5, 1992). "The [district court] specifically found that [Ohman] wanted [Woodruff] out of his lab by May 25, 1992, and it appears most likely that this was the reason that he sent both May 25 letters." J.A. at 78 (Findings of Fact at 26). By putting Woodruff's professional and immigration status at great risk for questionable motives, Ohman acted recklessly.

### III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's judgment in favor of Woodruff.